IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020

**STATE OF TENNESSEE v. PAUL N. GALBREATH**

**Appeal from the Circuit Court for Humphreys County**
**No. 12718     Suzanne M. Lockert-Mash, Judge**

_____

**No. M2019-00290-CCA-R3-CD**
_____

The Defendant, Paul N. Galbreath, was convicted after a jury trial of the knowing physical abuse or gross neglect of an impaired adult, a Class C felony. See Tenn. Code Ann. § 71-6-119 (2011). In this appeal as of right, the Defendant contends that the evidence was insufficient to prove that he knowingly neglected or abused the victim. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

William B. Lockert, District Public Defender, and Drew W. Taylor, Assistant Public Defender, for the appellant, Paul N. Galbreath.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Matthew F. Stowe,[1] District Attorney General pro tem; and Shelly Morris Deloach, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

This case arises from the Defendant's physically abusing and neglecting his eighty-year-old mother, Minnie Galbreath ("the victim"), who suffered from advanced dementia. The victim lived with the Defendant beginning in October 2010 until she was removed from the home on September 30, 2011. The December 2013 term of the Humphreys

_____

[1] Before trial, the 23rd Judicial District Attorney General recused his office from this case, and General Stowe was appointed by the trial court.

County Grand Jury charged the Defendant with knowing physical abuse or gross neglect of an impaired adult.

The proof at trial established that the victim's husband, Norman Galbreath, died in June 2006. At that time, the Defendant undertook the victim's care, including acting as her attorney in fact for medical and financial decisions and transporting her to doctors' appointments. The Defendant and his two living sisters did not get along, and by all accounts the sisters were not involved in the victim's care. Medical records from 2006 indicated that the victim was complaining of some memory loss, although her treating medical provider wrote a letter to her attorney certifying his belief that she was competent. In 2010, upon the advice of the victim's medical provider, the Defendant moved the victim into his home.

The Defendant rented a trailer on a property adjacent to his parents' property. The trailer had one bedroom, which the victim used, and one bathroom. The Defendant's income consisted of a monthly Social Security Disability benefit; he had been in a motorcycle accident in 1978, which resulted in an injury to his neck and left side that deprived him of the use of his left arm. The Defendant also wore a neck brace as a result of an injury incurred during a car accident in 2006 or 2007. The Defendant stated that he spent the victim's entire monthly income, which consisted mostly of a Social Security Retirement benefit, on insurance premiums, the utilities on the victim's vacant home, and her personal expenses.

Family Nurse Practitioner David Yancey testified that he began treating the victim in 2006, at which time she did not have bruises, bedsores, or urinary tract infections (UTIs). The victim's medical records were received as an exhibit and reflected that on August 3, 2006, the victim was five feet, five inches tall and weighed 154 pounds. Mr. Yancey stated that the Defendant brought the victim to all of her appointments. Mr. Yancey's records indicated that on April 5, 2007, the victim weighed 130 pounds. On April 22, 2008, the victim weighed 127 pounds. On May 20, 2008, Mr. Yancey noted that the victim had a "flat affect," meaning she did not exhibit emotion, and that she weighed 123 pounds. On November 17, 2008, the victim weighed 124 pounds. On August 13, 2009, the victim weighed 116 pounds.

Mr. Yancey testified that in March 2010, the victim was treated for a UTI and an eye infection. On July 8, 2010, the victim weighed 118 pounds and was treated for a UTI. On August 27, 2010, Mr. Yancey stated that the medical record reflected the victim's having had a severe UTI at her last visit as a result of "wetting on herself," which had since improved. The victim also had a red mark on her back that measured three inches by two inches, which was filled with "a yellow material which is called [slough]," which was healing tissue. Mr. Yancey noted that the sore was likely caused by "rubbing against the

-2-

bed" and would have been treated by protecting the sore with a wound dressing. The victim weighed 89 pounds. Mr. Yancey stated that by the August 2010 visit, the victim "progressive[ly] deferred to [the Defendant] and allowed him to speak for her." Mr. Yancey said, though, that "she was still oriented as to who she was, w[h]ere she was, why she was there." On September 22, 2010, the victim was seen for a "recheck of UTI." The notes indicated that the victim had "just gotten out of generations" and was at the Defendant's home; Mr. Yancey also noted at this visit that the victim was "sun downing," which referred to a patient with dementia's "wak[ing] up at bedtime when everybody else [was] going to sleep." Mr. Yancey stated that this side effect of dementia made providing care more difficult. Mr. Yancey said that the victim's dementia was worsening and that although she could still answer questions, the Defendant sometimes prompted her.

On May 26, 2011, the victim was seen for a small cut on her arm from a reported fall and a UTI; she weighed 86 pounds. Mr. Yancey noted that the Department of Human Services (DHS) had been in contact with his office regarding the victim and that DHS frequently communicated with him thereafter with the goal of improving the victim's health. At a July 14, 2011 visit, the Defendant reported that the victim had fallen "the weekend before," and she had an abrasion on her left arm as a result. Mr. Yancey stated that the victim had gained a "small amount of" weight, that she was suffering from urinary incontinence, and that she was wearing an adult diaper. Mr. Yancey stated that urinary incontinence could result from frequent UTIs, which were common in "very elderly" people and "sometimes very hard to get rid of." Mr. Yancey said that UTIs could be caused by the presence of "unwiped fecal matter," failure to change an adult diaper for an extended period of time, or wiping the genital area in the wrong direction after toileting. Mr. Yancey stated that he discussed proper wiping habits with the victim when she had a UTI.

Mr. Yancey testified that he prescribed home health assistance for the victim because the victim needed skilled nursing and "skilled care." He agreed that the Defendant was unable to provide the level of care the victim needed due to his disability. Mr. Yancey also prescribed physical therapy for the victim because she could not walk unassisted, which was common in light of her dementia. Mr. Yancey stated that the home health nurses were his "eyes and ears" in the home.

Mr. Yancey testified as a result of hearing "a number of complaints . . . by the home healthcare workers," he visited the victim at the Defendant's home on September 30, 2011. As a result of the workers' complaints, the victim's condition, and her declining weight, he "felt that it was important to get her out of that home[.]" He stated that the victim "was in a condition . . . called failure to thrive." The victim was sleeping in a "near fetal position"; she had lost muscle mass; she had a bruise around her left eye and a "two inch by two inch bruise" on the left side of her chin; and her eyes and mucosa were dry, which Mr. Yancey said indicated her taking in an inadequate amount of fluids. The victim was "clearly

disoriented" and unable to answer any but "the most simple of questions," which represented a "profound change from previous visits." The Defendant told Mr. Yancey the bruising on the victim's face was caused by a recent fall.

Mr. Yancey also identified three "herpetic" sores, which looked like "shingles" and were probably bedsores "in an area chronically exposed to urine" on the victim's hips, as well as bedsores on her back. Mr. Yancey testified that given the fragility of the victim's skin, the sores could have been caused by exposure to urine for "[a]s little as hours." Mr. Yancey stated that the victim's blood pressure was slightly elevated and that although she had been treated for hypertension in the past, her high blood pressure on that occasion could have represented "a compensation." Mr. Yancey stated the victim was "clearly malnourished if not ca[chec]tic."[2] Because of the "degree of deterioration" and the bruises, Mr. Yancey opined that the victim had been abused and neglected.

An October 3, 2011, letter authored by Mr. Yancey at the request of "social services" was received as an exhibit and reflected that at the home visit, Mr. Yancey noted that the victim was "seriously disoriented, and was looking forward to visits from people who are dead or do not exist, and [she] was not able to describe recent events accurately." Mr. Yancey noted that the victim's "lucid periods" would become less frequent as her dementia progressed and that the situation was exacerbated by a chronic UTI. Mr. Yancey wrote that he could not "expect to treat it successfully if she [was] continually exposed by a wet diaper to urine and feces, since bacteria can travel to the urethra easily under these conditions." Mr. Yancey continued,

> This person is in imminent physical danger . . . . [S]he has obviously lost weight, and is literally skin and bones. With open sores, some of which are directly exposed to urine and feces, and others which are indirectly so exposed, there is no way to prevent infection. We obtained her diaper . . . and it weighed over a pound. This represents over a pint. And in her case must represent her urine output over an extended period of time.
>
> . . . . [T]he evident lack of care . . . and the failure to mobilize or even turn her constitute clear neglect. While her urinalysis and blood pressure did not indicate patent dehydration, her loss of weight could certainly suggest malnutrition.

---

[2] Merriam-Webster dictionary defines cachectic as "affected by cachexia," meaning "general physical wasting and malnutrition usually associated with chronic disease." https://www.merriam-webster.com/dictionary/cachectic; https://www.merriam-webster.com/dictionary/cachexia (Last accessed Aug. 6, 2020).

Mr. Yancey wrote that he "must also consider whether [the Defendant's] actions constitute[d] abuse. Bruising [was] observed on the . . . chin and at the left eye orbit [.]" Mr. Yancey commented that although he had a "genuine affection for" the Defendant, who had also been a longstanding patient of his and "had a hard life, and a long struggle," there was "a basic human dignity lacking" in the victim's living conditions. Mr. Yancey wrote that the Defendant was "clearly frustrated, but [could not] see the situation as the vast majority of others, including professionals in the field, [saw] it." Mr. Yancey estimated that the victim had less than one year to live in light of her "rapid decline." He stated his belief that "neglect" was contributing to the decline, and he noted a "risk of her suffering direct harm, whether intended or not." Mr. Yancey wrote that although he could not guarantee that the victim would live longer if placed in a nursing facility, "she would be fed, bathed, turned, and treated with dignity." Mr. Yancey concluded that the victim deserved such care.

Mr. Yancey agreed that at the time of trial, he would be uncomfortable with the victim's returning to the Defendant's home. Mr. Yancey agreed that reports of verbal or physical abuse would be "critical factors" to his determination of whether the Defendant intended to harm the victim.

Mr. Yancey testified that the Defendant's disability could make him unstable while walking. Mr. Yancey denied that he ever saw the Defendant yell at, berate, push, or mistreat the victim. Mr. Yancey saw the Defendant help the victim when she became unsteady on her feet, although Mr. Yancey never saw the victim fall. The Defendant helped the victim enter and exit his vehicle and the building during her appointments.

Mr. Yancey characterized the victim's UTIs as chronic; he noted that one bacteria culture identified "resistant staph" and that he prescribed multiple medications in an effort to treat it. He agreed that the victim's UTI was "[n]ot necessarily" caused by the conditions in the home he witnessed on September 30, 2011.

Mr. Yancey testified that people with dementia often refused to eat or had difficulty eating, which could have been caused by the loss of smell or taste or because they forgot that they were hungry. Mr. Yancey acknowledged that the victim's weight loss could have been caused by dementia. He agreed that a person with dementia might roll from one position in bed to another in spite of a caregiver's turning the person to prevent bedsores. Mr. Yancey noted that elderly people "seem[ed]" to bruise easily and that it was possible that the victim's medications and age contributed to larger bruises than would result to a younger person. Mr. Yancey stated that his assessment of the cause of bruising in an elderly person would change if the person were "taken out of a situation" and no longer experienced bruising.

Mr. Yancey testified that on the September 30 home visit, the house was "basically clean." He stated that depending upon a person's fluid intake, the person would produce between one pint and one quart of urine per day. Mr. Yancey stated that based upon his observations, he did not "believe [the Defendant] intended any harm" to the victim or that he was neglecting her.

Trisha Poole testified that she had formerly worked as a home healthcare aide for six years; her duties included washing bedsheets, cleaning and cooking, bathing clients and helping them with personal hygiene, and turning clients in bed to prevent bedsores. Ms. Poole was sent to the Defendant's home to provide services to the victim; she was not previously acquainted with either of them.

Ms. Poole testified that she only visited the Defendant's home once on August 18, 2011. The Defendant showed Ms. Poole around the house, and they looked in on the victim, who was sleeping, from the open bedroom door. Ms. Poole stated that the victim was lying on the bed "in a Depends underwear and she had a bra but it wasn't on her. It was more around her neck and she was extremely skinny[.]" Ms. Poole noted that it was unusual for a client not to be dressed when she arrived. Ms. Poole further noted that although a blanket was on the floor, no blankets covered the victim.

The Defendant told Ms. Poole that he wanted the victim to stay asleep, and he asked Ms. Poole to clean the bathroom. Ms. Poole stated that the bathroom was "disgusting," that urine was on the toilet, that the sink contained toothpaste and hair shavings, and that the bathtub had mildew around it. While Ms. Poole cleaned, the telephone rang; after the Defendant answered the call, he came into the bathroom and told Ms. Poole that nurses were coming and that he had to wake up the victim. Ms. Poole offered to help get the victim up and explained that it was her job to help the victim get cleaned up and changed, but the Defendant declined and said that he wanted to do it.

After the Defendant went to the victim's bedroom, he asked Ms. Poole for a wet rag. When Ms. Poole brought the Defendant a rag, he woke up the victim

> and immediately started screaming at her and telling her that she needed to wipe her a--; and continually telling her . . . that she was doing it wrong, that she needed wipe her a--, she needed to stand up. And then he went out in the hallway; and he was still yelling [at] her; and that's when I made the decision that I needed to use my phone and record what was going on so that I could show my boss and figure out what we needed to do with the situation.

The recording was received as an exhibit and contained two parts. In the first recording, a man's voice stated, "Now you put it on just exactly like that, grab it by the top.

-6-

Put it down there, put [your] foot through it." The man spoke loudly and tersely. The man stated something indecipherable, then repeated his command to "put it on" and "put your foot through it." A significant amount of background noise made it difficult to understand the man's words. A very soft woman's voice was audible at times responding to the man, but it was not clear what she said. The man began to yell as he repeated himself, and he eventually yelled, "You're not going to sit on the bed." The man said, "I told you not to turn it around, I told you not to wad it up, [indecipherable] . . . you'll be d--n glad the girl . . . is here or you'd be sitting up here on your naked a--."

In the second recording, which also had a high level of background noise, the same man was heard yelling, "That there's the front. Put it on." The soft woman's voice responded, "Yes, sir." The man continued yelling, "Get the other one in there. Gee, it's funny how you don't have that much trouble when it [indecipherable] . . . explaining to you you'll sit your a-- out here naked. Imagine that." A second woman's voice, which Ms. Poole identified as her own, commented that she could wipe up the floor again. The man spoke again and said, "Stand there right there where you're at and don't you move."

Ms. Poole testified that the victim appeared to be "fragile," very thin, dehydrated, and unsteady while walking. Ms. Poole stated that the victim was not "sufficiently sturdy to be able to handle the treatment she was receiving physically from the [D]efendant." Ms. Poole indicated that neither the victim nor the Defendant seemed to be hard of hearing.

Ms. Poole noted that when she recorded the Defendant's conversation, she was inside the bathroom, and the victim and the Defendant stood outside of the bathroom in the hallway. The Defendant was holding an adult diaper and a nightgown; he handed the diaper to the victim and told her that she needed to "hold it up and she needed to put her leg in it"; and the victim tried to lean over and lost her balance. According to Ms. Poole, the victim called the Defendant "Norman," and he began "to flip out," pushed the victim against the wall, and said, "that's not my 'effing' name." The victim could not keep her balance; she asked the Defendant, "[D]o I have to do it?" and the Defendant answered affirmatively. The victim asked if she could sit on her bed, and the Defendant "screamed at her and told her, '[N]o, she couldn't sit on the bed.'" When the Defendant referenced the victim's being lucky that "that girl" was present, the Defendant pointed at Ms. Poole. The victim tried to lean on the Defendant's right arm while putting on the adult diaper, and he pushed her against the wall.

Ms. Poole testified that after the victim put on the adult diaper, she tried to put on the nightgown, but placed her arm in the "head hole instead of the arm hole." The Defendant again pushed the victim against the wall, at which time the victim "started to do it better." Ms. Poole noted that it was at this point in the recording that the Defendant stated that the victim's "problems" with dressing went away when someone told her that

she would be made to sit naked. Ms. Poole stated that when the Defendant pushed the victim, it was not "calculated" to help her put on her clothes. Ms. Poole stated that the first instance of pushing appeared to be done out of anger; the second appeared to be his "pushing [the victim] off of him"; and the third appeared to be done because the victim angered him by not putting on the nightgown correctly. Ms. Poole saw the Defendant use one hand during the first instance of pushing and both his right hand and left arm during the latter two instances of pushing. Ms. Poole noted that during her visit, the Defendant "moved" his left hand and arm "a little bit," although he did not use it for "detailed things." When asked to describe the amount of force the Defendant used against the victim, Ms. Poole described that the victim weighed about eighty pounds at the time of Ms. Poole's visit, that the victim was standing about ten inches from the wall before the Defendant pushed her, and that she heard the victim's body "thud" against the wall each time the victim was pushed.

Ms. Poole testified that the Defendant used "a lot of profanity" and that the victim responded by saying, "[Y]es, sir." Ms. Poole stated that when the home health care nurses arrived, the Defendant's "demeanor completely changed." Ms. Poole said that the victim ate "quite a bit" for the nurses, including two eggs, sausage, and "two big glasses of liquid."

While the victim was in the kitchen with the nurses, Ms. Poole cleaned the victim's bedroom. Ms. Poole noted that she had seen three-week-old bedsheets in other clients' homes and that the other sheets "never looked even close to" as dirty as the victim's sheets. Ms. Poole stated that eighty percent of the sheets were covered in dried feces and urine, and she estimated that the sheets had not been changed "in months." Ms. Poole stated that the bedroom smelled strongly of urine, and she compared the smell to a cat's litter box "that hadn't been changed in a month." She stated that the mattress was not covered in plastic and that as a result, the mattress was soaked in urine and feces. Ms. Poole also noticed that the inside bedroom doorknob was missing. Ms. Poole asked the Defendant if he had the missing pieces so that she could repair it, but the Defendant stated that he would fix it later.

Ms. Poole testified that the mattress and box spring were on the floor, which was unusual in her experience. Ms. Poole noted that if a client had an issue with falling out of bed, it was common to place the bed up against a wall and use a barrier on the other side.

Ms. Poole testified that she felt unsafe with the Defendant because of his aggressive behavior, noting that "if [the Defendant was] going to be aggressive towards [his] mother, then how aggressive would [he] be toward somebody [he didn't] care about at all[?]" Ms. Poole testified that she was afraid that the Defendant would "blow up and hit [the victim]" or "do something that would leave her . . . extremely hurt" or that the victim would fall. Ms. Poole stated that the Defendant did not permit the victim to have any assistance when

-8-

walking. Ms. Poole stated that the recording accurately reflected the Defendant's tone and level of aggression during his entire exchange with the victim. Ms. Poole identified a sound in the first recording as the sound of the victim's hitting the wall.[3] Ms. Poole stated that the Defendant would not allow Ms. Poole to come close enough to the victim to help her. Ms. Poole ultimately decided not to return, and she had no further contact with the Defendant or the victim.

Linda Lowe testified that she had known the Defendant and the victim for between ten and twelve years, and she described the victim as a "sweet loving, Christian woman." Ms. Lowe stated that the victim's husband Norman died in 2006 and that the victim was "sort of lost" and depressed for a time. The Defendant privately hired Ms. Lowe to assist the victim during a lapse in the victim's home health visits, and Ms. Lowe subsequently obtained employment with a home healthcare agency in order to continue taking care of the victim.

Ms. Lowe testified that between October 2010 and September 30, 2011, she visited the victim twice per week around midday. Ms. Lowe testified that in "a woman's view," the Defendant's house was not clean. She stated that on occasions, the sink was "just piled up with dishes" and that she found rat droppings on the countertop. She stated that the Defendant did not want Ms. Lowe to give the victim "a lot of help" because he wanted the victim to "stay independent" and "not get lazy." As a result, the Defendant wanted the victim to walk, bathe, and eat without Ms. Lowe's assistance. Ms. Lowe opined that the victim was "too we[a]k and couldn't see" to perform these tasks, and she also noted that the victim's lucidity varied. Ms. Lowe stated that the Defendant sometimes left during her visits and that when the Defendant was not present, Ms. Lowe did "everything [she] could do" for the victim, including holding on to the victim while she walked, assisting the victim with showering and toileting, and changing her clothing. Ms. Lowe did not know whether the Defendant performed these tasks for the victim when Ms. Lowe was not present. Ms. Lowe stated that if the Defendant was present during her visits, she had to "have [the victim] do for herself as much as she could." Ms. Lowe said, though, that the victim was able to do very little for herself.

On one occasion in which the victim was having trouble feeding herself, she told Ms. Lowe that she could not see out of one eye and that the vision in her other eye was cloudy. The victim had previously had surgery on one eye and could distinguish light from dark, but she could not see "finer things" like her food. Thereafter, Ms. Lowe filled the victim's fork and handed it to her, and the victim could guide the fork to her mouth. Ms. Lowe also handed the victim drinks so that the victim would not accidentally knock them

---

[3] The sound was not evident upon our review, and the record does not reflect the time-stamp in the recording at which Ms. Poole identified the sound.

over.  Ms. Lowe did not see the victim eat when the Defendant was present, and as a result, she did not know whether the Defendant helped the victim eat.  Ms. Lowe noted that without help, the victim made "messes" of her food.

Ms. Lowe testified that on one occasion, the Defendant was present while the victim was eating and Ms. Lowe could not help her, and the victim was "having to feel around" and knocked food off of her plate.  The Defendant took the plate away from the victim and stated, "[U]ndoubtedly she's not hungry, she's sitting there throwing it all over the place and making a mess."  The victim was not permitted to continue eating.  The Defendant left, and Ms. Lowe later brought the victim food from her home.  Ms. Lowe commented that the victim always ate well for her, and she recalled one day when the victim ate two bowls of cereal and drank two cups of coffee for breakfast, then ate a large bowl of soup and banana pudding for lunch.  Ms. Lowe stated that when she informed the Defendant about the amount of food the victim ate, the Defendant responded, "[Y]eah, and the less food you feed her, the less messes she makes," referring to the victim's having bowel movements when she was in bed.  Ms. Lowe stated that she knew the Defendant was not joking when he made the statement.

Ms. Lowe testified that on one occasion, when she arrived at the house, the victim had feces on her hands, and feces were on the bed and the walls.  Ms. Lowe stated that the victim had taken her adult diaper off in bed and attempted to clean herself.  Ms. Lowe stated that the victim had "accidents" and that Ms. Lowe believed the victim could not get out of her room at night because the interior doorknob had been removed.  Ms. Lowe said, though, that she could not "swear to" the door's being kept shut at night.  Ms. Lowe commented that she would rather clean the walls than the victim be hungry and that she "kept sneaking food up to her."

Ms. Lowe testified that the Defendant kept food in the home, and she recalled certain incidents when she found a plate in the refrigerator for the victim that the Defendant had prepared.  She stated that the plate contained "little small portions" and that the Defendant said that the victim did not eat much.  Ms. Lowe said, though, that the victim ate everything on the plate and acted as though she wanted more.  Ms. Lowe would find the victim cookies or a banana to eat, and she began bringing more food from her own home.

Ms. Lowe testified that on one occasion, the victim needed to shower because she had wet the bed.  The victim was confused that day, and the Defendant came into the bathroom after receiving a telephone call that someone from home health was on their way.  Ms. Lowe understood that the victim needed to hurry and get cleaned up.  The Defendant instructed the victim to step into the bathtub and she "acted unsure" because she could not see where to step.  The Defendant told Ms. Lowe not to let the victim grab "the shower thing because he didn't want her tearing it up."  The Defendant grabbed the victim's hand.

Ms. Lowe stated that the Defendant seemed angry. Ms. Lowe said that the victim got "nervous and upset and it[ was] just like her mind would blank out" when the Defendant raised his voice. When the Defendant moved into the bathroom to grab the victim's hand, Ms. Lowe moved away from the victim because she did not want to "be rubbing up against a man's body[.]"

Ms. Lowe noted that the victim needed to hold onto something in order to get into the shower. Ms. Lowe stated that the shower/tub combination did not have hand rails and that it was not safe for the victim to step into the tub unaided. As the victim lifted her foot the Defendant grabbed the victim and "shoved" her into the shower. Although Ms. Lowe could "not say" whether it was done purposely, the Defendant pushed the victim "too far and she . . . hit the wall" with the front left side of her face. Ms. Lowe characterized the Defendant's actions as "trying to manhandle her into the shower," and she characterized the incident as "partly push, partly fall[.]" Ms. Lowe opined that "an elderly woman that fragile should not [have been] manhandled." Ms. Lowe believed that the Defendant was upset, that he meant to push the victim, and that if he had not pushed the victim, she would not have fallen.

Ms. Lowe testified that the Defendant did not allow the victim to use the recliner or sofa in the living room because he did not want her "soiling the chair," but instead, the Defendant made her sit in a metal folding chair. The Defendant told Ms. Lowe that when the victim would not sit still in the chair, he made the victim sit on the floor. One day, the Defendant told Ms. Lowe that the victim sat on the floor from "sometime that evening" until 2:00 or 2:30 a.m. When asked why the victim was made to sit on the floor as "punishment," Ms. Lowe stated, "Because she would scoot up and down in her chair . . . and move around; and I guess he was afraid she would fall out of the chair." However, the Defendant had never informed Ms. Lowe that the victim had previously fallen out of her chair. Ms. Lowe related an incident in which she cut the victim's toenails and had her sit in the recliner; Ms. Lowe felt the need to explain to the Defendant, who "didn't like it," that the chair would not be soiled because she lined it with extra blankets.

Ms. Lowe testified that the Defendant said one day that he took the victim's food away from her because she was "acting stupid or being stupid and making messes" and "acting like she was blind." Ms. Lowe did not know if the Defendant was speaking to her or the victim. Ms. Lowe described another incident in which the Defendant "smacked" the victim's hands down when she attempted to guide herself while walking by touching the hallway wall.

Ms. Lowe testified that the victim's mattress and box spring were on the bedroom floor and that although the victim could stand up out of bed unaided, "it was a struggle." Ms. Lowe stated that when she arrived at the Defendant's home, the victim would routinely

be asleep with a soiled diaper. Ms. Lowe always helped the victim out of bed, out of her soiled clothes, and into the shower. Ms. Lowe noted that sometimes the victim was dressed in bed, but other times "she would wiggle around and get them all twisted and pulled off[.]" Ms. Lowe agreed that the victim needed "a lot of care." Ms. Lowe stated that the victim lost weight and that her clothes were significantly too large. Ms. Lowe bought the victim new clothing and new bedsheets.

Ms. Lowe testified that she had previously worked in a nursing facility and that she discussed the cost of facility care with the Defendant. Ms. Lowe explained that her ex-mother-in-law lived in a nursing facility for three years and that the family was given the option to pay monthly or "they would take her property and sell it to cover the expenses[.]" The Defendant told Ms. Lowe that he did not want the victim to go to a nursing facility because "he didn't want to lose the property up there[.]" Ms. Lowe stated that the Defendant bought horses after his father's death and that he sometimes left during Ms. Lowe's visits to buy hay for the horses.

Ms. Lowe testified that although the Defendant allowed the home healthcare workers to visit, on the day before the victim was removed from the home, he refused additional services from a DHS representative, Jan Poole,[4] who offered to sign the victim up for another program. Ms. Lowe did not recall the reason why the Defendant did not "accept" the other program.

Ms. Lowe testified that the victim was quiet and "folded into herself" when the Defendant was upset with her. Ms. Lowe stated that "[l]ike a big percentage of the people and the population does[, the Defendant] would raise his voice and holler at her." Ms. Lowe denied, though, that the Defendant spoke loudly in general. Ms. Lowe affirmed that the Defendant yelled at the victim and that she had heard "some cuss words come out." Ms. Lowe denied that the victim ever spoke back to the Defendant. Ms. Lowe stated that the victim's arms and legs "looked like bones with skin stretched over them."

Ms. Lowe identified a photograph of the victim that depicted her condition when she was removed from the Defendant's home, including bruising on the left side of the victim's face, and Ms. Lowe noted that the bruises were caused by the Defendant's pushing the victim into the shower. Ms. Lowe recalled that the victim had "red spots," but she did not recall seeing a bed sore of the severity depicted in one of the photographs. She noted that she had not seen the victim for about one week before her visit with Jan.

---

[4] The record did not indicate whether Trisha Poole was related to Jan Poole. Nevertheless, because they share a surname, we will refer to Jan Poole by her first name for clarity. We intend no disrespect.

Ms. Lowe testified that on September 30, 2011, she and Jan took the victim out of the Defendant's home and to the victim's doctor's office. Ms. Lowe asked the victim if she wanted to come with her and Jan, and the victim answered affirmatively. The victim stated that she was hungry, and she ate three chicken strips, an order of french fries, and a banana. Ms. Lowe stated that the victim was removed from the Defendant's home due to neglect.

Photographs of the victim taken by Jan were received as an exhibit. Although the photographs were blurry, it was evident that the victim was emaciated and had bruises under her right eye, on the left side of her forehead, and on the left side of her chin.

Family Nurse Practitioner Mary Genung, the victim's treating medical provider at the time of trial, testified that she began treating the victim at a nursing facility in 2015. Ms. Genung identified current photographs of the victim, which showed no bruising and depicted a healthy-looking elderly woman. The victim's legs were substantially larger than they had been in the previous photographs. Ms. Genung commented that the victim was generally "doing fine" and "look[ed] great." Ms. Genung denied that the victim had any bedsores. The victim weighed 107 pounds, which Ms. Genung characterized as "a good weight with advanced dementia." The victim required assistance with all of her activities of daily living, such as eating and toileting, and instrumental activities of daily living, which were "fine motor movements and things like that." The victim mostly stayed in her bed and did not "say much or do much."

The nursing facility staff reported that the victim ate well with assistance, and the facility provided three meals per day, as well as snacks. The victim had to be turned in bed every two hours at a minimum, and Ms. Genung noted that because the victim was incontinent, she would be moved more often and her adult diaper checked "pretty regularly." Ms. Genung commented that she had never visited the victim and found her to be wet. Ms. Genung stated that the victim had experienced "a couple" UTIs, which she did not characterize as chronic and which generally resolved with treatment. Ms. Genung described the victim's skin condition as "great" and rated it as a four out of five.

Ms. Genung testified that the victim's medical records indicated that when she was admitted to the nursing facility in 2011, she had "quite a few bedsores" or pressure ulcers on her heels, hips, buttock, elbow, and back, as well as abrasions on her body. Ms. Genung stated that the victim was malnourished and weighed 96 pounds. The victim had diagnoses of dementia, failure to thrive, and gastroesophageal reflux disease (GERD).

Ms. Genung testified that after admission to the nursing facility, the victim gained weight, her bedsores healed, and she had not had similar health issues. Ms. Genung noted that the victim's weight had been as high as 134 pounds during her time at the nursing

facility and that given the victim's lack of physical activity, 107 pounds was a healthy weight.

Ms. Genung described failure to thrive as a lack of the will to live or depression, characterized by a patient's not wanting to eat and the body's beginning to shut down. She agreed that failure to thrive could be caused by trauma, particularly in a patient with dementia. She stated, "if someone had dementia that can be quite an indicator 'cause . . . they're already confused; and so, if you have trauma and you add trauma to them then they're going to withdraw, so you have to be careful. It's like a child." Ms. Genung opined that as a result of the bedsores and malnutrition, the victim "probably didn't want to live."

On cross-examination, Ms. Genung testified that failure to thrive sometimes accompanied a move to a new location; however, she reiterated that once the victim moved to the nursing facility, she improved. She agreed that failure to thrive could occur after the loss of a spouse. Ms. Genung stated that patients sometimes turned themselves back to a favored position in bed in spite of the staff's turning them to prevent bedsores. Generally, two staff members turned a patient because they also changed the bedsheets and the patient's diaper at the same time. She denied that the victim was ever force-fed. She explained that food was offered to the victim and that if she did not want to eat, it was offered later as a snack. If a patient consistently refused to eat, alternatives such as a feeding tube would be considered; however, the victim did not have this issue.

Paula Henson testified for the defense that she was the Defendant's distant cousin, that she met the Defendant in 2009, and that at end of the summer in 2010, a doctor told the Defendant that he needed to move the victim to his home. The Defendant called Ms. Henson and asked her to help care for the victim. Ms. Henson stated that she stayed at the Defendant's home for two to eight weeks at a time. The Defendant paid Ms. Henson to bathe, dress, and feed the victim. Ms. Henson stated that the victim sometimes did not want to eat, but that the victim ate something every day and typically had two or three meals and snacks. The victim communicated when she was hungry, and Ms. Henson always had food in the house. Ms. Henson agreed that the victim's physical condition deteriorated during the time she lived there. Ms. Henson and the Defendant took the victim to doctors' appointments. Ms. Henson stated that home health workers began coming sometime after she began caring for the victim, and the workers would "take her vital signs," do exercises with the victim, and bathe her. Ms. Henson indicated that the Defendant cooperated with the home health workers. Ms. Henson said that if a home health worker had testified that no one else was in the home, the worker might have come during a time when Ms. Henson had gone back to her house.

Ms. Henson testified that the Defendant allowed her to assist the victim with walking and that although the Defendant helped the victim however she needed, he

preferred for Ms. Henson to handle tasks like bathing the victim. When the victim stepped out of the shower, Ms. Henson would ask the Defendant to help her, and the victim would place her hand on the Defendant's shoulder for support. Ms. Henson denied that she ever saw the Defendant push or manhandle the victim. She also denied that the Defendant had "a temper" or raised his voice around her or the home health workers. She stated that the Defendant cleaned the house when it was needed. Ms. Henson stated that the Defendant customarily cooked dinner for the victim, and Ms. Henson fed her cereal in the mornings and sandwiches for lunch. When Ms. Henson was in the home, the victim's bed was in a bed frame, and the bedroom was clean.

Ms. Henson testified that she obtained other employment sometime in 2011, but that she continued to visit the victim on the weekends and when the schools were closed. She agreed that the Defendant loved the victim and "was trying to do the best that he could do for her," and she denied that the Defendant would "intentionally or knowingly ever hurt her."

Ms. Henson testified that she did not "pay attention" to the victim's weight or notice that the victim's clothing did not fit. Ms. Henson stated that she and the victim wore the same size in tops consistently through 2010 and 2011 and that the victim sometime wore Ms. Henson's clothing. Ms. Henson noted that the victim mostly dressed herself, although the victim sometimes mistakenly put something on backward or placed her arm through the wrong hole. Ms. Henson stated that the Defendant was typically in another room when she helped the victim dress. She agreed that the Defendant was concerned the victim might fall in the shower and that he requested that Ms. Henson help the victim with showering. Ms. Henson agreed that the Defendant was aware that the victim could fall while walking or getting into the shower. She also said, though, that she was unsure why the Defendant asked Ms. Henson to assist the victim and commented that "[w]e just thought it best that she had help." When asked whether the Defendant understood how dangerous it was for the victim to perform activities unassisted, Ms. Henson responded, "We never discussed it and I'm not really sure how he felt." She stated that she and the Defendant did their best to take care of the victim.

The Defendant testified that he was sixty-one years old, that his parents were married for fifty years, and that the victim was "messed [up]. . . real bad" when her husband passed away. The Defendant stated that after his father's death, he "straightened out" a lien on the victim's home during the course of one year. The Defendant said that the victim began having "mini-strokes" that caused her dementia. He noted that the victim was allergic to "everything," including pork and dairy, and that he monitored what she ate. The Defendant stated that the victim did well following her move to his home in late 2010, but that she eventually began to decline. He stated that "[t]hey [were] trying different things on her" as a result of her allergies to some medications. The Defendant noted that after

home health workers began coming into the home, "she seemed to get a lot worse a lot faster."

The Defendant testified that Ms. Henson came to help "when she could" and that in mid or late 2011, home health and "another outfit" began coming to the house to help the victim. Ms. Henson stayed with them for about three weeks at a time. He stated that a nurse was "pretty good" and "the girl that come [sic] out to give her baths and stuff was real nice." He noted that a physical therapist came a few times, then gave the Defendant a list of exercises, which the victim only did once.

The Defendant recalled a physical therapist's "trying to tell [him] how to do stuff with one hand and [the Defendant] was supposed to be doing it with two [hands] to make them happy." The Defendant noted that the therapist "fussed at" him because he could not "walk" the victim using two hands. He said, though, that the physical therapist did not show him how to do anything with one hand.

The Defendant testified that Ms. Henson "was more of a nighttime person" and that she watched the victim so that the Defendant could go grocery shopping and attend his doctor's appointments. The Defendant noted that he or the victim had appointments about once per week. He stated that his doctor was located in a busy part of town and that the victim would wander if left unattended. The Defendant stated that for a time, the victim was able to participate in a conversation, but that as she declined, she made little sense and eventually stopped wanting to talk to people.

When asked about the incident in which Ms. Lowe saw the Defendant take away the victim's food, the Defendant stated that the victim "pick[ed] through her plate" like a child who did not want to eat and that she pushed food off of the plate. The Defendant said that he placed the food back on the plate and that the victim resumed pushing it off the plate. The Defendant believed that he told Ms. Lowe that the victim would push food she did not want off of the plate. The Defendant stated that the victim would ask for a particular food to eat and that sometimes she would eat it, but other times she would eat some or none of it.

When asked about the pushing incident in the shower, the Defendant recalled that Ms. Lowe was having trouble with the victim while trying to bathe her. He stated that after twenty minutes in which he heard Ms. Lowe talking to the victim, she "hollered at" him and asked for his help. He said that when he entered the bathroom, Ms. Lowe was trying to get the victim to sit down on a shower stool, but that the victim was "rared [sic] back" on a "old flimsy hose pipe" on the shower head. Together, they were able to sit the victim down, but Ms. Lowe remembered that she needed to wash the victim's "behind" and asked for the Defendant's assistance to help the victim stand. The Defendant stated that he "put

a little pressure against [the victim's] shoulder[,] not enough to do no damage of any kind," and that when Ms. Lowe reached under the victim to wash her, the victim "jumped" and hit the shower.

The Defendant testified that if needed, he helped the victim bathe, but that it embarrassed him and that he preferred for someone else to perform this task. He noted that "the Bible" stated that a child was not supposed to see his mother without clothing. The Defendant averred that the victim also "wanted to do what she could for herself." The Defendant said that the metal folding chair was the strongest chair in the house and that he had placed a cushion on it, but that the victim would "soak" the cushion within ten minutes of sitting down. The Defendant said that he would remove the cushion and clean the chair, and the victim would sit back down in the chair. The Defendant denied that he forced the victim to sit on the floor, and he claimed that she wanted to sit on the floor and watch television. He averred that he allowed the victim to do whatever she wanted, so long as it would not hurt her.

The Defendant testified that on a normal day, the victim would wake up between 7:00 and 9:00 a.m.. He would help the victim sit down on the toilet, then he took her a cup of coffee to help her wake up before showering. The Defendant would help the victim wash her hair and back, then he handed her a washcloth to finish washing herself. After the victim was cleaned up, they went to the kitchen, and the Defendant made her breakfast. He said that the victim usually ate one bowl of cereal and drank two or three cups of coffee. The Defendant stated that Ms. Lowe usually arrived before 1:00 p.m., and he noted that the victim would sometimes go back to bed after being up for an hour. During the day, the Defendant and the victim usually went to doctors' appointments and to pay bills. The Defendant also cooked the victim whatever she wanted for dinner. He noted that the victim sometimes refused to eat. The Defendant testified that the victim lost a little bit of weight during Ms. Henson's time with her, but that she began refusing to eat more than one or two bites of food after the home health workers started coming.

When asked to explain Ms. Lowe and Ms. Poole's testimony that he did not want the home health workers to help the victim, the Defendant testified that he was unable to support the victim with two arms and that if the victim "jerk[ed]" his left arm, "it would un plug [sic]" him "from the neck down" and that they would both fall. He averred that if the home health workers used both arms, the victim did not understand why the Defendant could not also use both arms. He stated that he "could not physically help her the way [home health] wanted[.]" The Defendant said that he communicated his concerns to the home health workers, but that it "went in one ear and right out the other" and that the workers wanted the Defendant to "do it [their] way." The Defendant said that it frustrated him that the workers did not understand what he told them. The Defendant testified that the physical therapist was "the worst one about it" and that she started "getting loud like if

-17-

she got louder it made her more right[.]" The Defendant noted that he "figured it was [his] right to get loud talking to her" in response because it was his house.

The Defendant testified that on September 20, 2011, Mr. Yancey, a nurse, Ms. Lowe, and a woman from Adult Protective Services came to the door. The woman told the Defendant that Mr. Yancey's "nurse" wanted to visit the victim and take her with them. The Defendant told them the victim was sleeping, and when he stepped aside to let them in, the woman pushed past him and "took off down the hall just . . . stomping and yelling" the victim's name. The woman turned on the light in the victim's bedroom and took photographs of her. The woman loudly asked the victim if she wanted to eat, and the victim "popped up." The Defendant stated that the victim's left hand and the left side of her face were blue because she was sleeping on that side and did not have good circulation. The Defendant averred that the victim's face and hand had returned to a normal color by the time the woman from Adult Protective Services took her into the kitchen. After the victim sat down, the group of people left, and he made the victim breakfast. The Defendant denied that he was upset or agitated at the group of people, although he acknowledged being "a little bit short" with Mr. Yancey because "of the way he was acting."

The Defendant testified that he tried to treat the victim's bedsores with "Indian salve," which the nurses did not like. They obtained "something special for cleaning and dressing it," and the Defendant bought large bandages; however, the victim tore off the bandages. He averred that when he rolled the victim over in bed, she would return to her original position, which reflected the way she had customarily slept with Mr. Galbreath. The Defendant stated that the victim sometimes "acted like she was hard of hearing. Either that or stubborn just ignoring [him]."

The Defendant testified that he did not recall the incident depicted on the audio recording Ms. Poole made. He opined that the recording was a "put-up" and that the man's voice was not his. He denied that he would have pushed the victim against the wall "to hurt her." He stated, though, that he may have "tried to catch her and that was the only way" to accomplish that. He denied physically harming the victim, calling her names, cursing at her, telling her that she could not sit on the bed to put on her diaper, or wanting her to dress herself and walk independently. He stated, though, that after Ms. Lowe "started spoon feeding [the victim] like a little baby," the victim refused to feed herself. He denied becoming angry when the victim could not perform tasks independently.

The Defendant testified that the victim's bed was on the floor at the recommendation of one of the home health workers. The Defendant stated that the victim fell regularly, including when walking up the steps to the trailer, getting out of the Defendant's truck, getting out of bed, and walking into the bedroom. He stated that he held the victim's hand when she walked. He noted that she used a cane and that her balance deteriorated after they began "messing with eye doctors[.]" The Defendant stated that although the home

health workers recommended that the victim use a walker, the victim did not want to use one because her mother had used one. The Defendant did not think a walker was a good idea because it was "much more for her to get tangled up in when she [fell]" and because the trailer's hallway might have been too narrow to accommodate a walker.

The Defendant averred that the victim's bedsheets were changed between thirty and forty-five times per month. He said that he changed the victim's sheets every time they were "messed up" and that he wrapped the mattress in plastic, disinfected the plastic, and used "pads" to absorb any liquid. He assumed that the home health workers also changed the sheets as needed. The Defendant stated that the victim would pull off her adult diapers when they were full and place them beside the bed. He said that he did not "have a problem" with feces from the diapers getting onto the bed, and he noted that the victim had only "soil[ed] that diaper that way" once.

The Defendant testified that he could not afford for the victim to go to a nursing facility. He noted that neither of his parents wanted to go to a nursing facility after an experience in which the victim's mother had to be discharged from a facility after being there for one month. The Defendant stated that he inquired with a facility and was told that unless the victim had "private insurance," it "wasn't going to be a very good deal." The Defendant stated that he would have sold half of the victim's property to pay for her care but for the cost of the required survey. The Defendant denied "intentionally or knowingly" neglecting or abusing the victim.

When asked why Adult Protective Services removed the victim from his home, the Defendant stated, "I know what they told me," which was that it was for the victim's safety. He agreed that the victim had a conservator. The Defendant stated that he had never seen "holes in" the victim of the type depicted by a photograph of a bedsore.[5] He characterized one red spot on the victim's hip as a place where she had scratched herself. The Defendant denied that the victim had a soiled diaper for an extended period. He said that Mr. Yancey was "guessing" at the amount of time it would take for a person to produce one pint of urine, and he averred that the victim had been wearing the diaper for two hours at the time Mr. Yancey took it.

The Defendant testified that he chopped wood with an ax or splitting maul for the wood-burning stove. He stated that he bought horses because his mother wanted them and that he fed them hay and "sweet feed" that came in fifty-pound bags.

---

[5] A photograph of a severe bedsore was mentioned several times during the trial. However, none of the witnesses were able to establish that the photograph was of the victim; as a result, the photograph was not introduced as an exhibit, although it appears to have been shown to the jury during the State's opening argument.

Upon this evidence, the Defendant was convicted as charged, and the trial court sentenced him to five years, with four years suspended to supervised probation. He timely appealed.

## ANALYSIS

On appeal, the Defendant contends that the evidence was insufficient to sustain his conviction, arguing that the State did not prove a knowing mental state. The State responds that the evidence is sufficient.

When examining the sufficiency of the evidence, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

At the time of the offenses, Tennessee Code Annotated section 71-6-119(a) (2011) provided that it was "an offense to knowingly, other than by accidental means, physically abuse or grossly neglect an impaired adult if the abuse or neglect result[ed] in serious mental or physical harm." For purposes of this section, "it is not necessary for the [S]tate to prove the adult sustained serious bodily injury as required [for aggravated assault], that the elements set out in subsection (a) occurred." Tenn. Code Ann. § 71-6-119(b) (2011). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11- 302(b). Abuse or neglect was defined, in relevant part, as follows:

> the infliction of physical pain, injury, or mental anguish, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult or a situation in which an adult is unable to provide or obtain the services that are necessary to maintain that person's health or welfare.

Tenn. Code Ann. § 71-6-102(1)(A) (2011). A caretaker, in relevant part, is a person who "has assumed the duty to provide for the care of the adult by . . . agreement," as well as an "adult child [who] . . . [r]esides with . . . the adult," "[k]nows or reasonably should know of the adult's mental . . . dysfunction," and "[k]nows or reasonably should know that the adult is unable to adequately provide for the adult's own care[.]" Tenn. Code Ann. § 71-6-102(5)(A), (B)(i)-(iii).

The Defendant's sufficiency issue relates to the weight of the evidence and the jury's credibility determinations, which this court will not disturb on appeal. Bland, 958 S.W.2d at 659. The Defendant's argument relies on his testimony that he transported the victim to medical appointments and "eventually she lived in his home where he provided for her day to day needs." The Defendant also cites Mr. Yancey's statement that the Defendant "did not abuse or neglect his mother."

Mr. Yancey testified that based upon his observations, he did not "believe [the Defendant] intended any harm" to the victim or that he was neglecting her. However, Mr. Yancey's letter stated that the "evident lack of care" and the failure to turn the victim or mobilize her to prevent bedsores constituted "clear neglect" and that "neglect" was contributing to her rapid decline. He also noted that given the bruises to the victim's face, the possibility that the Defendant was abusing the victim had to be considered. Mr. Yancey further testified that at the time of trial, he would be uncomfortable with the victim's returning to the Defendant's home. Mr. Yancey agreed that reports of verbal or physical abuse would be "critical factors" to his opinion relative to the Defendant's intent to harm the victim; likewise, he stated that an elder's lack of bruising following a change in environment would affect his opinion about the cause of the bruising.

-21-

The jury, by its verdict, discredited the Defendant's assertion that he provided for the victim's needs; likewise, although Mr. Yancey provided conflicting statements regarding the Defendant's culpability in the victim's neglect, the jury resolved any inconsistencies in his testimony in favor of the State.

In the light most favorable to the State, the record supports the jury's determination that the Defendant was aware that his conduct was reasonably certain to cause "physical pain, injury, or mental anguish, or the deprivation of services by a caretaker" to the victim. Ms. Lowe testified that the Defendant specifically stated that he did not want the victim to eat too much because she would soil her adult diaper more often. The Defendant fed the victim extremely small amounts of food, and Ms. Lowe had to sneak food to the victim when the Defendant was not home. The victim lost a vast amount of weight after the Defendant took over her care; although some weight loss could be attributed to the aging process and the victim's dementia, the victim quickly gained weight once she was in the nursing facility and being fed regularly.

Ms. Poole's recording documented the Defendant's yelling at the victim and speaking to her in a demeaning manner when she could not dress herself, causing the victim to call the Defendant "sir." Ms. Lowe corroborated Ms. Poole's description of the Defendant's aggression toward the victim and her "folding into herself" when the Defendant became angry. When the victim was removed from the Defendant's home, she was diagnosed with "failure to thrive," which could have been caused by trauma, and which resolved once she received appropriate care.

Likewise, in spite of knowing that the victim was unsteady on her feet, the Defendant pushed her into the shower, causing her to hit her head with enough force to cause a substantial bruise. During the two hours Ms. Poole was in the home, she observed three additional instances of the Defendant's pushing the victim into a wall. The Defendant would not allow other caretakers to help the victim with walking, toileting, showering, or eating, all of which the victim could not perform without assistance. The testimony indicated that the Defendant knew the victim was at risk to fall but, nonetheless, insisted that she walk independently in order to prevent her from becoming "lazy." After the victim left the Defendant's home, her bedsores, urinary tract infections, and bruises healed.

The jury, by its verdict, discredited the Defendant's testimony that he did his best to care for the victim; instead, the jury credited the testimony of multiple witnesses that the victim slept in squalid conditions. The Defendant punished the victim for being unable to attend to her own needs by taking away her food and forcing her to sit on a metal chair or the floor. The Defendant also withheld food from the victim because he wanted her not to need changing as often; at her removal from the home, the victim's unchanged diaper contained one pint of liquid, which reflected her urine output over an extended period. The

victim's bedsheets had not been changed and were caked with feces and stained with urine over eighty percent of their surface, and the victim suffered from untreated bedsores. The victim's UTIs were prolonged because she was not kept clean. The Defendant withheld ambulatory aids, increasing the victim's chance of a dangerous fall. The Defendant repeatedly pushed the victim and verbally abused her. The record amply supports the verdict in this case. See, e.g., State v. Mattie Florence Sweeney, No. M2016-02372-CCA-R3-CD, 2018 WL 1559973, at *11 (Tenn. Crim. App. Mar. 29, 2018) (concluding relative to the defendant's knowing mental state that "[t]here was proof from which the jury could determine [d]efendant was, by taking the victim under her roof, caring for and supervising the victim while knowing his condition and limitations and still failed to take proper action to care for his basic needs." The evidence established that the victim resided in squalid conditions for several days before being found by the police, that the victim was suffering from E. coli infections and told medical personnel that he hurt "all over," and that several other people living in the house affirmed that the victim was staying there and needed assistance with daily activities). The Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE